IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 07–cv–00252–EWN

TERESA A. SZCZECINA,

     Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

     Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

---

     This is a social security benefits appeal.  Plaintiff Teresa A. Szczecina challenges the final

decision of the Commissioner of Social Security (the "Commissioner") denying her application for

social security disability insurance benefits under Title II of the Social Security Act.  *See* 42

U.S.C. §§ 406–33 (2006).  Jurisdiction is premised upon 42 U.S.C. § 405(g).

## FACTS

### 1.   *Medical Evidence*

     Plaintiff was born on September 5, 1954.  (Admin. R. at 47 [filed May 10, 2007].)

Plaintiff emigrated from Poland to the United States in or about 1972.  (*Id.* at 43, 151.)  Plaintiff

appears to have received a high school education.  (*See id.* at 68.)  Plaintiff worked in the

vocationally relevant past as a meat packer, motel cleaner, and a manager of a motel owned by

her husband. (*Id.* at 100, 159.) Plaintiff alleges that she became disabled on February 10, 2001, due to depression, panic attacks, arthritis, insomnia, and pain in her back, neck, and shoulders. (*Id.* at 47, 50.) Plaintiff was last insured for disability benefits through September 30, 2002. (*Id.* at 59.) Thus, Plaintiff must prove she was totally disabled prior to that date. *See Henrie v. Dep't of Health & Human Servs.*, 13 F.3d 359, 360 (10th Cir. 1993).

In a July 1999 intake form for the chiropractic office of Timothy K. Brady, D.C., Plaintiff reported that: (1) her pain came and went; (2) she was not presently taking any medication; and (3) her pain impacted her "daily routine" but not her work. (*Id.* at 145.) From July 21, 1999, to July, 29, 1999, Plaintiff returned to Dr. Brady four times. (*Id.* at 139–46.) On the initial visit, Plaintiff rated her back pain at a level of seven out of ten. (*Id.* at 146.) By July 29, 1999, Plaintiff rated her pain at a level of four out of ten. (*Id.* at 139.) Plaintiff returned to Dr. Brady for two visits after an exacerbation in late August 1999, rating her pain on the first visit at a level of ten out of ten and then at an eight out of ten on the second visit. (*Id.* at 137–38.)

Thereafter, Plaintiff did not return to Dr. Brady until August 2002, when she reported severe pain when getting out of bed. (*Id.* at 135.) Plaintiff returned to Dr. Brady ten times during the next two and one-half months, and Dr. Brady observed gradual improvement in Plaintiff's level of pain. (*Id.* at 125–34.)

On September 18, 2003, Plaintiff saw Charles Rademacher, D.O., because of shortness of breath and an increased heart rate that had persisted after she suffered a panic attack earlier in the week while in Chicago for her brother's funeral. (*Id.* at 97.) Dr. Rademacher assessed "anxiety/stress" and prescribed an antidepressant and an anti-anxiety medication. (*Id.*)

On December 13, 2003, Plaintiff returned to Dr. Rademacher, complaining of a cough, insomnia, and continued panic attacks. (*Id.* at 95.) Dr. Rademacher assessed "panic attacks" and discontinued Plaintiff's antidepressant prescription. (*Id.*)

Throughout September 2004, Plaintiff visited Dr. Brady ten times. (*See id.* at 118–24.) Plaintiff reported severe pain in the first four visits and moderate pain in the next three visits. (*Id.*) On the last three visits, Plaintiff reported pain at a level of three out of ten. (*Id.* at 115–17.) Throughout four visits in October 2004, Plaintiff's pain remained stable. (*Id.* at 111–14.) From November 2004 through early February 2005, Plaintiff only occasionally saw Dr. Brady, reporting mild pain. (*Id.* at 104–10.)

After having occasionally seen Dr. Rademacher for a persistent upper respiratory infection throughout 2004, (*id.* at 92–94), Plaintiff returned to Dr. Rademacher on February 9, 2005, complaining of severe back pain, which chiropractic treatment was no longer resolving, (*id.* at 91). Plaintiff also reported that she was no longer taking her anti-anxiety medication. (*Id.*) Dr. Rademacher prescribed an antidepressant and referred Plaintiff to a neurologist. (*Id.*)

On February 21, 2005, Plaintiff saw neurologist Brian P. Witwer, M.D., concerning her back pain. (*Id.* at 68–71.) Plaintiff reported severe pain in her spine that was not responding to treatment. (*Id.* at 68.) Dr. Witwer assessed degenerative disc disease of the lumbar and cervical spine, a collapsed disc, and lumbar strain. (*Id.* at 70.) Dr. Witwer noted that Plaintiff had undergone "extensive conservative therapy." (*Id.* at 71.) Dr. Witwer ordered an MRI. (*Id.*)

On February 23 and 28, 2005, Plaintiff returned to Dr. Brady with severe back pain. (*Id.* at 102–03.)

On March 3, 2005, Plaintiff returned to Dr. Witwer after having an MRI. (*Id.* at 64.) Plaintiff reported that her severe pain persisted. (*Id.*) The MRI revealed diffuse degenerative changes of the lumbar spine, but no apparent intrusion upon Plaintiff's spinal cord. (*Id.*) Dr. Witwer recommended physical therapy and steroid injections. (*Id.*)

On April 6, 2005, C.E. Lear, M.D., completed a mental functional capacity evaluation of Plaintiff. (*Id.* at 146–48.) Dr. Lear opined that Plaintiff had mild difficulty: (1) understanding and carrying out simple instructions; (2) interacting with the general public; (3) interacting with supervisors and coworkers; and (4) responding to usual work situations. (*Id.* at 146–47.) Dr. Lear further opined that Plaintiff had moderate difficulty: (1) understanding and carrying out complex instructions; (2) making work-related judgments; and (3) interacting with the general public. (*Id.*)

On June 20, 2005, Dr. Rademacher wrote a letter addressed "To Whom it May Concern," noting he had been seeing Plaintiff for two years and that her back pain had increased during that time. (*Id.* at 90.) Dr. Rademacher opined that Plaintiff was "unable to perform her normal occupation." (*Id.*)

On June 28, 2005, Dr. Brady wrote a letter to the Colorado Disability Determination Services. (*Id.* at 100–01.) Therein, Dr. Brady asserted that Plaintiff had been disabled since February 2001 due to her "spinal-related condition." (*Id.* at 101.)

## 2. *Procedural History*

On February 23, 2005, Plaintiff filed an application for Title II disability insurance benefits. (*Id.* at 47–49.) On June 14, 2005, the Colorado Disability Determination Services denied

Plaintiff's application.  (*Id.* at 39–41.)  On May 31, 2006, an administrative law judge ("ALJ")

held a hearing, at which Plaintiff appeared *pro se*, along with her friend Anna Lassak, whom the

ALJ swore in as a translator.  (*Id.* at 149–71.)  A vocational expert ("VE") also testified at the

hearing. (*Id.*)

Plaintiff testified that she had lived in the United States for about thirty-five years.  (*Id.* at

154.)  Plaintiff said that she lived in Fruita, Colorado, with her nineteen-year-old daughter and her

husband.  (*Id.* at 155, 165.)  Plaintiff represented that she used to live in Chicago, Illinois, and had

worked there in a meat packing plant.  (*Id.* at 158–59.)  Plaintiff represented that she had helped

manage her husband's motel in Fruita when he first bought it, about ten years ago.  (*Id.* at 155,

167.)  Plaintiff stated that she had also cleaned rooms in the motel.  (*Id.* at 158, 166.)

Plaintiff asserted that problems with her back and her hand now prevent her from helping

her husband with the motel.  (*Id.* at 156, 158.)  Plaintiff testified that she did not recall how long it

had been since she stopped working.  (*Id.* at 155.)  Plaintiff testified that numerous doctors had

told her to stop working because of her back pain, but that she could not remember the names of

any of those doctors because of memory problems.  (*Id.* at 159.)

Plaintiff testified that she saw "Dr. John" once a month for her back problems.  (*Id.* at

160.)  Plaintiff testified that she saw "Dr. Mike" about once a month for her depression.  (*Id.* at

157.)  Plaintiff stated that she took "a lot" of prescription medications, including medications for

anxiety, high blood pressure, and back pain.  (*Id.* at 161.)  Plaintiff represented that she took

medication for her back every day.  (*Id.* at 162.)

Plaintiff represented that she spent much of her time sitting, but that too much sitting

caused severe pain in her spine. (*Id.* at 163, 164.) Plaintiff stated that she walked to a nearby

park for exercise, but that walking too far made her fearful and tired. (*Id.* at 163.) Plaintiff

testified that her husband and daughter took care of the household. (*Id.* at 164.) Plaintiff said

that she drove only to the grocery store. (*Id.*)

Plaintiff testified that she had a problem with a Polish woman whose voice she heard "all

the time." (*Id.* at 166.) Plaintiff stated that her husband and children did not believe that this

woman existed. (*Id.*)

The VE testified at the hearing regarding Plaintiff's capacity for work. (*Id.* at 168–70.)

The VE opined that a person such as Plaintiff could not return to her past work as a meat packer

or motel cleaner, but that she could do a variety of light sedentary work. (*Id.* at 169–70.)

On June 23, 2006, the ALJ issued a decision, finding that Plaintiff was not disabled prior

to the date on which she last met the insured status requirements: September 30, 2002. (*Id.* at

19.) In reaching her conclusion, the ALJ first found that Plaintiff had not engaged in substantial

gainful activity at any time relevant to the case. (*Id.*) The ALJ next determined that Plaintiff's

back impairment constituted a "severe" impairment, but that such impairment did not meet or

equal any of the impairments listed in Appendix 1, Subpart P, Regulations Number 4. (*Id.* at 20.)

Based upon her consideration of the evidence, the ALJ found that Plaintiff was less than fully

credible and determined that Plaintiff's residual functional capacity ("RFC") permitted her to

engage in a full range of light work. (*Id.*) The ALJ determined that Plaintiff was capable of

performing her past work as a motel manager. (*See id.*) Finally, the ALJ concluded that Plaintiff

was not under a "disability" at any time through September 30, 2002. (*Id.* at 20–21.)

On August 1, 2006, Plaintiff requested a review of the ALJ's decision. (*Id.* at 10–11.) On December 1, 2006, the Appeals Council affirmed the ALJ's decision. (*Id.* at 7.) On February 5, 2007, Plaintiff filed a complaint in this court challenging the Commissioner's denial of disability benefits. (Compl. [filed Feb. 5, 2007].) On August 14, 2007, Plaintiff filed her opening brief. (Pl.'s Opening Br. [filed Aug. 14, 2007] [hereinafter "Pl.'s Br."].) On October 11, 2007, the Commissioner filed a response. (Def.'s Resp. Br. [filed Oct. 11, 2007] [hereinafter "Def.'s Resp."].) On November 2, 2007, Plaintiff filed her reply. (Pl.'s Reply Br. [filed Nov. 2, 2007].) This matter is fully briefed.

## ANALYSIS

### 1.  *Standard of Review*

Section 405(g) of the Social Security Act establishes the scope of this court's review of the Commissioner's denial of disability insurance benefits. *See* 42 U.S.C. § 1383(c)(3) (2006) (incorporating review provisions of 42 U.S.C. § 405[g]). Section 405(g) provides, in relevant part, that:

> [t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied by the Commissioner of Social Security or a decision is rendered under subsection (b) of this section which is adverse to an individual who was a party to the hearing before the Commissioner of Social Security, because of failure of the claimant or such individual to submit proof in conformity with any regulation prescribed under subsection (a) of this section, the court shall review only the question of conformity with such regulations and the validity of such regulations.

42 U.S.C. § 405(g) (2006). Thus, this court's review is limited to determining whether the record as a whole contains substantial evidence supporting the Commissioner's decision. *See id.*;

*Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992).

"Substantial evidence" means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Jozefowicz v. Heckler*, 811 F.2d 1352, 1357 (10th Cir. 1987) (citations omitted). The court must uphold the Commissioner's decision if it is supported by substantial evidence. *See Dollar v. Bowen*, 821 F.2d 530, 532 (10th Cir. 1987). This court cannot reweigh the evidence nor substitute its judgment for that of the ALJ. *Jordan v. Heckler*, 835 F.2d 1314, 1316 (10th Cir. 1987). That does not mean, however, that this court's review is merely cursory. To find that the ALJ's decision is supported by substantial evidence, the record must include sufficient relevant evidence that a reasonable person might deem adequate to support the ultimate conclusion. *Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987). A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it. *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985). The ALJ's decision is also subject to reversal for application of the wrong legal standard. *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Frey*, 816 F.2d at 512.

## 2.     *Evaluation of Disability*

The qualifications for disability insurance benefits under the Social Security Act are that the claimant meet the insured status requirements, be less than sixty-five years of age, and be under a "disability." *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991). The Social Security Act defines a disability as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A) (2006). In proving disability, a claimant must make a *prima facie* showing that she is unable to return to the prior work she has performed. *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988). Once the claimant meets that burden, the Commissioner must show that the claimant can do other work activities and that the national economy provides a significant number of jobs the claimant could perform. *Frey*, 816 F.2d at 512.

The Commissioner has established a five-step process to determine whether a claimant qualifies for disability-insurance benefits. *See* 20 C.F.R. § 404.1520 (2008); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987) (describing five-step analysis). A claimant may be declared disabled or not disabled at any step; and, upon such a determination, the subsequent steps may be disregarded. *See* 20 C.F.R. § 404.1520(a) (2008); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988). First, the claimant must demonstrate that she is not currently involved in any substantial gainful activity. 20 C.F.R. § 404.1520(b) (2008). Second, the claimant must show a medically severe impairment (or combination of impairments) which limits her physical or mental ability to do basic work activities. *Id.* § 404.1520(c). At the third step, if the impairment matches or is equivalent to established listings, then the claimant is judged conclusively disabled. *Id.* § 404.1520(d). If the claimant's impairments are not equivalent to the listings, the analysis proceeds to the fourth step. At this stage, the claimant must show that the impairment prevents her from performing work she has performed in the past. *See Williams*, 844 F.2d at 751 (citations omitted). If the claimant is able to perform her previous work, she is not disabled. 20 C.F.R. §

404.1520(f) (2008); *Williams*, 844 F.2d at 751. The fifth step requires the Commissioner to demonstrate that: (1) the claimant has the RFC to perform other work based on the claimant's age, education, past work experience; and (2) there is availability of that type of work in the national economy. *See* 20 C.F.R. § 404.1520(g) (2008); *Williams*, 844 F.2d at 751.

### 3.    *Disability Determination*

Plaintiff sets forth five arguments in support of her contention that the ALJ's decision is erroneous. (Pl.'s Br. at 8–32.) Plaintiff asserts that the ALJ erred by: (1) failing to provide a qualified foreign language interpreter and failing to obtain a valid waiver of counsel; (2) failing to exercise the heightened duty to develop the record given Plaintiff's *pro se* status; (3) misjudging Plaintiff's credibility at step four; and (4) failing to address all of the relevant evidence in the record. (*Id.* at 8–28.) Additionally, Plaintiff contends that, on appeal to this court, she has presented new evidence that necessitates remand under 42 U.S.C. § 405(g). (*Id.* at 28–32.)

I do not consider all of Plaintiff's arguments because errors made early in the sequential process necessitate remand. Below, I first find that the ALJ did *not* err with respect to providing an interpreter or informing Plaintiff of her right to counsel. I then find that the ALJ's exclusive reliance on chiropractic records to conclude that Plaintiff had a medically determinable impairment was improper, and that such error infected every subsequent step of the sequential process. Next, I find that the ALJ erred by failing to develop Plaintiff's testimony adequately. Finally, I find that the ALJ did not err by failing to develop medical evidence from certain treating sources and, moreover, even if she did err in this regard, such error was harmless.

### a.  Advisements of Rights

Plaintiff, whose native language is Polish, faults the ALJ for failing to provide a qualified interpreter and failing to provide adequate advisement of the right to counsel. (*Id.* at 9–21.) Defendant argues that Plaintiff refused counsel and a qualified interpreter after adequate, repeated notice that she could have both. (Def.'s Resp. at 9–14.) I agree with Defendant.

In *Manzo v. Sullivan*, the district court considered an argument similar to Plaintiff's:

> Plaintiff . . . claims that the ALJ committed reversible error by failing to advise plaintiff of her right to counsel and a translator at the hearing. However, at the time she requested a hearing, a notation was made by the Social Security Administration that plaintiff was unrepresented and she had been provided with a list of "legal referral and service organizations." No indication was given at that time that she had any need of a translator at the hearing. At the hearing, plaintiff was accompanied by her two sons, one of whom stated that he would represent her and assist her in communicating with the ALJ. Both sons actively participated throughout the hearing process. Thus, plaintiff was not prejudiced by lack of counsel or lack of a translator and the ALJ did not commit reversible error.

784 F. Supp. 1152, 1158 (D.N.J. 1991).

Unlike the ALJ in *Manzo*, the ALJ in the instant case *did apprise* Plaintiff of her right to counsel at the hearing and *did offer* Plaintiff the opportunity to speak through a qualified translator. (Admin. R. at 151–54.) After consulting with her friend, Ms. Lassak, with regard to both issues, Plaintiff unequivocally elected to proceed without counsel or a translator — and then Plaintiff proceeded to answer the vast majority of the ALJ's questions in English without any assistance. (*Id.* at 151–58.) In light of this record, I cannot say that the ALJ failed to provide adequate advisement of Plaintiff's right to counsel or the opportunity to use a translator.

Even had the ALJ not adequately apprised Plaintiff of the right to counsel at the hearing, I

would still find that she did not err.  Here, just as in *Manzo*, at the time Plaintiff requested a hearing, a notation was made by the Social Security Administration ("SSA") that Plaintiff had been given a list of referral services through which she could obtain representation.  (*Id.* at 38.)  Plaintiff does not assert that this notation was made in error.  (*See* Pl.'s Br.)  Furthermore, unlike the *single* notice the *Manzo* plaintiff received,[1] in the instant case, SSA correspondence *repeatedly* apprised Plaintiff of her right to seek counsel.  (*See* Admin. R. at 25, 36, 41.)  Even assuming Plaintiff could not read such correspondence herself, it is fair to assume that someone else read it for her — otherwise Plaintiff could not have known to request a hearing or appear at such hearing.  If there could be any remaining doubt on this front, it is resolved by the fact that, at the hearing, Ms. Lassak stated that Plaintiff's children read the correspondence from the SSA and told Plaintiff how to proceed with her case.  (*Id.* at 153.)  There is no question that Plaintiff received adequate notice of her right to counsel.

Further, assuming that the ALJ did not give Plaintiff the opportunity to employ a qualified translator at the hearing, I would still find that the ALJ did not err.  Here, just as in *Manzo*, at the time Plaintiff requested a hearing, a notation was made by the SSA that Plaintiff did not request a translator.  (*Id.* at 38.)  Again, Plaintiff does not assert that this notation was made in error.  (*See* Pl.'s Br.)  Moreover, as noted above, Plaintiff represented that she spoke English and answered almost all of the ALJ's questions without any assistance.  (Admin. R. at 151–68.)  Nevertheless, just as the ALJ did in *Manzo*, the ALJ here took the extra step of allowing Plaintiff to use a

---

[1]Indeed, the social security statutes and regulations do not require anything more than such single written notice.  *See* 42. U.S.C. § 406(c) (2006); 20 C.F.R. § 404.1706 (2008).

layperson, Ms. Lassak, to help her communicate in the hearing. (*See id.* at 151–68.) Although the ALJ took the extra step of swearing Ms. Lassak in as a translator, the record demonstrates that Ms. Lassak's role as such was limited. (*See id.*) Ms. Lassak occasionally stepped in to ask the ALJ to clarify questions or to help Plaintiff elaborate on her answers. (*See id.*) Plaintiff has pointed to no binding authority suggesting that the ALJ's decision to permit Ms. Lassak to help Plaintiff is reversible error. (*See* Pl.'s Resp. at 9–21.) Moreover, practically speaking, Plaintiff has failed to argue persuasively that the ALJ's chosen course was anything less than fair and reasonable. (*See id.*)

In sum, Plaintiff received repeated written and oral communications regarding her right to counsel and the opportunity to use a translator. Plaintiff repeatedly, unequivocally refused those rights. The ALJ went out of her way to assure, on the record, that Plaintiff made informed decisions about how to proceed with her case. This was not error.

### b. *Step Two Determination*

The ALJ determined that, as of September 30, 2002, Plaintiff suffered from the following severe medical impairment: "cervical/lumbar degenerative joint disease." (Admin. R. at 3.) The only medical evidence upon which the ALJ based this finding were the records of Plaintiff's chiropractor, Dr. Brady. (*See id.*) This was erroneous.[2]

"Acceptable medical sources" include licensed medical or osteopathic doctors, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language

---

[2]In light of recent precedent discussed below, the court raises this issue *sua sponte*.

pathologists. 20 C.F.R. § 404.1513(a) (2008). "'Only 'acceptable medical sources' can provide evidence to establish the existence of a medically determinable impairment[;] only they can provide medical opinions, and only they can be considered treating sources." *Frantz v. Astrue*, — F.3d —, 2007 WL 4328794, at *2 (10th Cir. Dec. 12, 2007) (citing 20 C.F.R. §§ 404.1513[a], 404.1527[a][2], [d]).

'The regulations, however, also contemplate the use of information from 'other sources,' both medical and non-medical." *Id.* (citing 20 C.F.R. §§ 404.1502, 404.1513[d]). Chiropractors are listed among "other sources." *Id.* (citing 20 C.F.R. § 404.1513[d][1]). The opinion of such "other sources" may only be employed as "evidence 'to show the severity of [a claimant's] impairment(s) and how it affects [a claimant's] ability to work.'" *Id.* (citing 20 C.F.R. § 404.1513[d]).

Because *only* an "acceptable medical source" can provide evidence "establish[ing] the existence of a medically determinable impairment," the ALJ erred in relying exclusively on a chiropractor's opinion in finding Plaintiff's "cervical/lumbar degenerative joint disease" constituted a medically determinable impairment pursuant to 20 C.F.R. § 404.1520(c). (*See* Admin. R. at 3.) Evidence from a chiropractor could only be properly considered "to show the severity of" Plaintiff's impairment and "how it affects [her] ability to work." *See Frantz*, — F.3d —, 2007 WL 4328794, at *2.

The ALJ's opinion makes *no* mention of the medical evidence of record beyond the records of Dr. Brady. (*See* Admin. R. at 3.) Most of this unmentioned evidence comes from "acceptable medical sources," but is dated after the expiration of Plaintiff's insured status. (*See*

-14-

*id.* at 58–98, 146–48.)  Presumably, the ALJ did not discuss such evidence because she concluded that it was not probative with regard to the dispositive issue in this case, whether Plaintiff was disabled prior to the expiration of her insured status on September 30, 2002.  While I typically would not remand for failure to discuss evidence post-dating the relevant time period, given that there is no "acceptable medical source" evidence predating the relevant time period, I cannot say that the ALJ's silence was justified.  *See generally Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996) ("[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence [s]he chooses not to rely upon, as well as significantly probative evidence [s]he rejects.").

On remand, the ALJ must first determine if the evidence supports a determination that Plaintiff is *presently* disabled.  *See* 20 C.F.R. § 404.1520 (2008).  If Plaintiff is not presently disabled, then the case is over (since there is no evidence in the record suggesting Plaintiff's conditions have improved since September 2002).  If she is disabled, then the ALJ should work through Plaintiff's medical records to determine whether they reveal an onset date before September 30, 2002.  *See* Soc. Sec. R. 83–20, 1983 WL 31249, at *2 (S.S.A. 1983) ("Medical reports . . . serve[] as the primary element in the onset determination.").  If such evidence is inconclusive, then the ALJ should follow Social Security Ruling 83–20's instructions regarding drawing reasonable inferences of disability.  *See id.* at *3–4; *see also Blea v. Barnhart*, 466 F.3d 903, 908–10 (10th Cir. 2006) (applying SSR 83–20 in a case where the claimant was found disabled but the onset date was unclear).

### c. Development of the Record

As noted above, Plaintiff appeared *pro se* at her hearing. (Admin. R. at 151.) The key question in Plaintiff's case — and, thus, the key question to be explored at the hearing — was whether Plaintiff was disabled prior to September 30, 2002. (*See id.* at 19–21); *Henrie*, 13 F.3d at 360.

In a social security disability case, the claimant bears the burden to prove her disability. *Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). However, "Social Security proceedings are inquisitorial, rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000); *accord Hawkins*, 113 F.3d at 1164 (stating the ALJ has a duty "to ensure that an adequate record is developed during the disability hearing consistent with the issues raised"). "This duty is especially strong in the case of an unrepresented claimant." *Carter v. Chater*, 73 F.3d 1019, 1021 (10th Cir. 1996); *cf. Hawkins*, 113 F.3d at 1167 ( "[I]n a counseled case, the ALJ may ordinarily require counsel to identify the issue or issues requiring further development."). Thus, at the hearing, the ALJ bore a heightened duty to develop an adequate record on the issue of whether Plaintiff was disabled prior to September 30, 2002. *See Hawkins*, 113 F.3d at 1164.

### i. Development of Plaintiff's Testimony

At the hearing, the ALJ did not attempt to explain to Plaintiff that her case required her to prove she was disabled *prior to* September 30, 2002. (*See* Admin. R. at 151–68.) This, of course, is not reversible error — adequate questioning on the issue would most certainly have

suffced to develop the record.  *See generally Sims*, 530 U.S. at 110–11.  Unfortunately, the

ALJ's own opinion reveals that she did not adequately question Plaintiff on this front.  In her

opinion, the ALJ faults Plaintiff because her "testimony at the hearing concerned the problems she

has at present time and the doctors she sees now.  The only testimony related to the period in

question was [Plaintiff's] statement that she worked at the motel with her husband in 2001."

(Admin. R. at 20.)  If, as the ALJ says, Plaintiff offered insufficient testimony regarding the period

in question, then the blame for such failure falls less upon Plaintiff, who appeared *pro se*, and

more upon the ALJ, who was charged with a heightened obligation of developing the record.  *See*

*Carter*, 73 F.3d at 1021.

Because the ALJ's own opinion reveals that she failed to develop Plaintiff's testimony

adequately, the ALJ's subsequent analysis — particularly the credibility determination and the

evaluation of Plaintiff's past relevant work — cannot be reviewed intelligibly.  Consequently, I

must remand the case for adequate development of Plaintiff's testimony.

### ii.     *Development of the Record of Treating Sources*

Plaintiff faults the ALJ for failing to seek additional medical records from "at least three

treating doctors" Plaintiff mentioned during the course of her testimony.  (Pl.'s Br. at 22–23.)

Specifically, Plaintiff asserts that the ALJ: (1) refused Plaintiff's "offer to give the ALJ contact

information" of these doctors; and (2) should have taken contact information from prescription

bottles Plaintiff brought to the hearing but left in her car.  (*Id.* at 22.)  Plaintiff's argument is

factually and legally unfounded.

First, Plaintiff's assertion that she "offer[ed] to give the ALJ contact information" for

additional medical sources is unsupported by Plaintiff's purportedly supporting record citations.

(*See id.* [citing Admin. R. at 159, 161–62].) At page 159 of the record, the following exchange is recorded:

> Q    Did you have a doctor that told you you needed to stop working?
> A    Yeah, my doctor tell me stop working, yes.
> Q    What doctor?
> A    Every one doctor tell me.
> Q    Name one.
> A    See I have a problem with my memory.  I, I, I can't remember.

(Admin. R. at 159.)  At pages 161 to 162, Plaintiff does not offer any contact information.  (*See id.* at 161–62.)

Moreover, Plaintiff's assertion that the ALJ erred by failing to take contact information from her prescription bottles is absurd.  Such an argument asks too much of an ALJ and expects too little of a *pro se* litigant.  It should be obvious to *anyone* who is pursuing a social security claim that it is in her interest to give the ALJ the records of all of her current treating sources.  It makes no sense to place a burden on the ALJ to sniff out each and every treating doctor a claimant might mention during the course of her hearing — and the case upon which Plaintiff relies in support of her argument that such a duty exits, *Carter v. Chater*, is readily distinguishable.  (*See* Pl.'s Br. at 22–23.)  In *Carter*, the claimant testified that she had consulted one Dr. Foley for "job stress," but submitted only the opinion of another psychiatrist, Dr. Baum, to the ALJ.  73 F.3d at 1021–22.  Dr. Baum's opinion concluded that the claimant had depression and mentioned that Dr. Foley had recently authorized two weeks of disability for the claimant.  *Id.* at 1022.  Nevertheless, the ALJ discounted Dr. Baum's diagnosis of depression because there

were "no medical tests to support it." *Id.* The Tenth Circuit determined that this was error because the ALJ "made no effort to obtain such tests or to determine what testing Dr. Foley might have performed." *Id.* Thus, I find that Plaintiff is wrong to read *Carter* for the proposition that any time there is a possibility that additional medical records may exist, an ALJ is required to seek them out. Rather, *Carter* merely stands for the sensible proposition that an ALJ cannot discount one medical opinion as unsupported when he is aware that another medical opinion, which is not in the record, would likely support the other. *See id.* Accordingly, I find that the ALJ did not fail to develop an adequate record of treating source evidence.

Moreover, the court simply cannot resist observing that the additional evidence Plaintiff submitted on appeal actually supports the extraordinary conclusion that, even if the ALJ *did* fail to develop the record of Plaintiff's treating sources at the time of her hearing, such error actually proved *helpful* to Plaintiff's case.

Although Plaintiff submitted a veritable laundry list of impairments on her application for disability benefits, on appeal, Plaintiff focuses exclusively on two purportedly disabling impairments: her back pain and mental illness. (*See* Pl.'s Br.) Of the "new" evidence Plaintiff submitted to this court that is, in fact, *actually* new, *none* is from the time period *before* the expiration of Plaintiff's insured status.[3] (*See id.*, Ex. B [New Evidence].) Of all of the new

_____

[3]Of Plaintiff's "new" evidence, the *only* records that predate September 2002 are treatment notes from Dr. Brady. (Pl.'s Br., Ex. B at 88–131 [Brady Treatment Notes From 7/99 to 2/05].) Those very same treatment notes *were part of the administrative record presented to the ALJ.* (*See* Admin. R. at 102–45 [Brady Treatment Notes From 7/99 to 2/05].) As the Commissioner correctly points out, much of Plaintiff's purportedly "new" evidence suffers from this bewildering defect. (*See* Def.'s Resp. at 22.)

evidence postdating the expiration of Plaintiff's insured status, only two sets of records relate to Plaintiff's back impairment. The first such set of medical records is comprised of additional treatment notes from Dr. Brady, dated from June 2005 to October 2005. (*See* Pl.'s Br., Ex. B at 132–42 [New Evidence].) Dr. Brady's notes add nothing. (*See id.*) The second set is comprised of treatment notes dated March 2005 through June 6, 2005. (*See id.*, Ex. B at 34–37, 77–78 [New Evidence].) This evidence reveals that Plaintiff began receiving a series of lumbar steroid injections in March 2005. (*Id.*) Prior that date, however, the only treatment Plaintiff received for her allegedly disabling back impairment was chiropractic therapy. (*See* Admin. R. at 99–148; Pl.'s Br., Ex. B [New Evidence].) Thus, Plaintiff's new evidence appears to support the conclusion that she became disabled, if at all, as of early 2005, when, for the first time, she began to receive aggressive steroid therapy for her back pain. *See, e.g.*, *Caldarulo v. Bowen*, 857 F.2d 410, 413 (7th Cir. 1988) (finding non-aggressive treatment inconsistent with severe disability allegations); *Noble v. Callahan*, 978 F. Supp. 980, 986 (D. Kan. 1997) (same).

Turning to evidence of mental illness, I note that the first instance of a complaint by Plaintiff of mental health issues in the record before the ALJ was in September *2003*, after Plaintiff had a panic attack at her brother's funeral. (*See* Admin. R. at 97.) Plaintiff's "new" evidence resoundingly confirms that her mental illness cannot be traced to a date preceding her brother's death. (*See* Pl.'s Resp., Ex. B [New Evidence].) In January 2006, Mike Gorman, D.O., wrote: "We are in the process of getting [Plaintiff] referred to psychiatry because she is so distraught over the death of her brother *two years ago*." (*Id.*, Ex. B at 45 [emphasis added].) The same month, John Cain, M.D., agreed: "[Plaintiff] has struggled with depression for some

time *since her brother died* of cancer a couple of years ago in Poland." (*Id.*, Ex. B at 26 [emphasis added].)  In February 2006, Dr. Lear wrote: "[Plaintiff's] brother died in Poland three years ago . . . . *Since then* she has become increasingly depressed.  She began experiencing hallucinatory phenomena on mid-sleep awakening and the family has become concerned." (*Id.*, Ex. B at 17 [emphasis added].)  Accordingly, in this court's view, Plaintiff's new evidence strongly supports the conclusion that her mental illness is traceable back to a point in time *after* the expiration of her insured status.

Thus, even if the ALJ could be said to have failed to develop the record by neglecting to seek out all of Plaintiff's treating sources, Plaintiff's own development of the record of such sources appears to reveal that such an effort on the ALJ's part would have undermined Plaintiff's claim for benefits.  Thus, even if the ALJ erred, such error was not harmful to Plaintiff.[4]  I must commend Plaintiff for her honesty in bringing such evidence to my attention.

## 4.    *Conclusion*

Based on the foregoing, it is therefore ORDERED that the Commissioner's decision is AFFIRMED in part and REVERSED in part.  The case is hereby REMANDED for proceedings consistent with this opinion.

---

[4]Even though the ALJ is not *required* to consider Plaintiff's new evidence on remand, *see Johnson v. Apfel*, 229 F.3d 1163, 2000 WL 1346214, at *3 (10th Cir Sept. 19, 2000) (Table), such evidence may nevertheless prove useful.  Of course, this court's analysis of such evidence is not binding on the ALJ.  *See Jordan*, 835 F.2d at 1316.

Dated this 24th day of January, 2008.

BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
Chief United States District Judge
